**Roy Lionel BELL and Laura McGee Bell, Individually, and as Husband and Wife, and for the Use and Benefit of the Minors, Jarrell M. Bell, Cory J. Bell, Lionel D. Bell and Agatha D. Bell**

v.

**MONTGOMERY WARD**

Civ. A. No. 88–1915.

United States District Court,
W.D. Louisiana,
Shreveport Division.

April 28, 1992.

Jack M. Bailey, Shreveport, La., for plaintiffs.

Lawrence W. Pettiette, Blanchard, Walker, O'Quin & Roberts, Shreveport, La., for defendant.

## OPINION

TRIMBLE, District Judge.

This matter was tried before the undersigned on March 23 and 24, 1992 in Shreveport, Louisiana. Plaintiffs, Roy and Laura Bell, seek damages individually and on behalf of their minor children for damages sustained when Roy Bell was mowing a lawn on October 7, 1987. On that date, while mowing the lawn of Mr. J.P. Somner in the early morning hours, Roy Bell severed the big and second toes of his left foot. The plaintiffs brought this action in strict liability, negligence, and redhibition.

### Summary of the Evidence

The plaintiff, Roy Bell, testified that he bought two lawn mowers from Montgomery Ward in June of 1987. He also testified that, although he had an active lawn service business, these lawn mowers remained unassembled in their boxes in his living room for approximately three to four months after the purchase. After assembling the mowers, one rear guard fell off the first time the mower was used, while being operated by the plaintiff's son, Jarrell, who was then 12 years old. The guard fell off of the second mower a few days later. Jarrell testified that he had been using the first mower for approximately thirty minutes when he pulled the mower

back over some grass and the toe guard fell off.

Roy Bell testified that two of his other mowers were broken and that it would have taken two or three weeks to get them fixed. That is why he decided to assemble and use these Montgomery Ward mowers. He read through the owner's manual while assembling the machines. Mr. Bell graduated from high school with a B+ average. The plaintiff had been to trade school where he learned car and appliance repair.

On October 7, 1987, Roy Bell arrived at the Somner house by himself at about 6:00 A.M. This was a very large yard of approximately seven acres. Roy Bell was cutting the front part of the lawn nearest to the house when the accident occurred. This portion of the yard is an incline which the plaintiff testified he was cutting in a rectangular pattern. He had traversed the lawn parallel to the house and as he turned the mower to start down the incline, his foot slipped, causing him to lose balance and pull back on the mower. As he pulled back on the mower, the mower ran over his foot, severing two toes through his tennis shoes. The accident occurred at about 8:30 A.M., and the grass was still wet with dew.

The plaintiff was in LSU Hospital for 17 days. Although he was injured in the early morning, he was not treated in the emergency room until 5:30 P.M. He experienced much pain occasioned by four surgeries and frequent bandage changes. He still experiences pain and has not regained full use of his foot. He cannot work by himself any longer, cannot work long hours, lift refrigerators, swim, run or play basketball with his children. Although he had a job prior to his injury working at a key shop, he quit that job and is now self-employed fixing appliances and doing limited yard work. He no longer sees a doctor, nor does he require any medication.

Jarrell Bell testified that his father never let the children operate the mower without his presence and that he had worked with his father in the yard business since he was 11. Jarrell testified that the mower was stored in the living room until assembled and that he had used one of the mowers

about an hour and forty-five minutes before the toe guard fell off. The guard fell off as he pulled the mower back over a pile of grass.

The next witness to testify was Mr. Paul J. Glasgow, P.E., a forensic engineering expert specializing in mechanical design and safety engineering. He received a B.S. in mechanical engineering from Polytechnic University in Brooklyn and is a Fellow of the American Society of Mechanical Engineers as well as the National Safety Council. Mr. Glasgow had examined the lawn mower and testified that the manner in which the rivets that attached the toe guard to the mower itself resulted in the minimal bearing area of the head of the rivets to directly press against the plastic flange of the toe guard. This caused the rivets to effectively cut through the plastic of the toe guard. Mr. Glasgow believed this assembly could have easily been strengthened by using steel washers or adding a metallic strip to lessen the stress concentration in these areas. The outer clamping edge of the rivet being used increased the likelihood of premature failure due to the cutting and tearing of the plastic. He also suggested affixing the guard to a hinge mounted bar that would alleviate stress at any point along the guard. Mr. Glasgow testified that this machine did comply with ANSI standard B71.1–1986, the applicable standard in this case. It did not, however, comply with *his* inferred standard of structural integrity. His ultimate conclusion was that this lawn mower design is defective due to the manner in which the rear toe guard was improperly attached to the surface of the steel shroud enclosure.

It is noted that Mr. Glasgow has never participated in the design or fabrication of any part of a lawn mower, nor has he had anything to do with developing lawn mower safety standards. He conducted no studies of the strength of the PVC plastic used in this guard, no pull tests, no durability tests, and no tests with the alternate designs he suggested.

Mr. Glasgow stated under cross-examination that he thought the warning was inad-

equate because nothing specifically was said about the danger of the foot going under the mower in the absence of the guard. Although he testified on direct examination that the type injury sustained by Mr. Bell was the kind the guard was intended to protect against, on cross-examination he implied in his testimony that he thinks the guard would not have prevented this particular accident even if it had been in place. To this extent he agreed with the defense expert. Mr. Glasgow did not even consider the Consumer Products Safety Commission (CPSC) requirements, the *mandatory* standards for walk-behind lawn mowers, when he made his analysis.

Andrew Evans is a vocational rehabilitation expert. Mr. Evans testified that the plaintiff's toe loss amounted to an 18% disability of the foot, or 13% disability of his lower leg. The plaintiff is restricted to intermittent walking, not to exceed 4 hours. Mr. Bell has reached maximum medical improvement and his residual work capacity is for light duty. There can be no repetitive use of the left foot and this amounts to a significant loss of earning capacity as Mr. Bell will not be able to pass pre-employment physicals. Most light duty and sedentary jobs require long hours of standing. Mr. Bell would require retraining, schooling, and on the job training to work at a minimum wage level. An average income for a man of Mr. Bell's age and educational level is $20,000.00. Computing even a 10% loss, Mr. Bell's earning capacity would be diminished by $2,000.00 per year, or $60,000.00 until he can retire in 30 years.

Dr. Melvin Harju, an economist, testified that Mr. Bell was off of work from the date of his injury, October 7, 1987, until just before Christmas. During that period, he would have had lost income from his regular job at the key shop, at which he was earning $4.42 per hour ($766.13 per month), as well as from other employment, from which he was reportedly making $1,000.00 per month. Since .21 years passed during this period, his loss of earnings for that period would have been $4,526.00. Although he had returned to his job at the key shop, he had not been able to return to his yard work or to his work as an appliance repairman. His loss through July of 1990 would have been $30,620, not taking into account any fringe benefits. Lost net earnings, as adjusted, amounted to $8,217.00 to $10,808.00. The present value of Mr. Bell's future net income is between $23,697.00 and $191,167.00, depending on the number of lost work hours per year. These figures did not account for the value of any lost household services, nor do they account for additional income from any other sources. These computations utilized an annual growth rate of .6% to adjust for the loss of real purchasing power.

Doug Tietzen, a physical therapist and physical rehabilitation expert, saw the plaintiff once for a 45 minute evaluation. He measured muscle atrophy, muscle bulk, and performed a cybex test. The muscles tested weaker in the whole lower extremity, there was measured atrophy of the left leg, discoloration of the foot, and plantar-flexion (inability to push off when walking). Loss of the great toe causes gait disturbances and the cybex can test for symptom magnification. Tietzen's objective findings were consistent with the plaintiff's subjective complaints. Physical therapy would be of no benefit in this case.

Mrs. Bell testified that the Bell family are Jehovah's Witnesses and her husband had been very involved in their church work. He also participated in sports activities before his accident, such as weight lifting, jogging, and basketball. Prior to the accident she did not work outside the home, but she did help him with his business by answering the phone and making appointments. After her husband was injured, she covered his job at the key shop from October 8 through about December 15, 1987. In March of 1991, her husband was laid off from his job at the key shop. At that point, he returned to yard work and appliance repair. He is basically restricted to supervising, however, as his endurance is greatly limited.

Mrs. Bell first learned of her husband's injury when she arrived at the Somner's house on October 7, 1987. She saw blood on the porch, then Mrs. Somner told her

that he had cut his foot and was at the hospital. Her husband stayed in the hospital 17 days, had several surgeries, walked on crutches, and had difficulty walking again. The doctors removed skin from his thigh to graft to his foot which seemed very painful. His thigh area is still very easily irritated. He complains often of pain and cramping. His foot is discolored.

Since the accident, Mrs. Bell has taken a job as a cook. Friends and family help to take care of the children while she is at work. Her husband gets frustrated because he cannot do those things that he used to be able to do. He cannot swim, cut back on weight lifting and he needs much more help now. He doesn't help much around the house anymore and finances are much tighter. At one point, they were forced to get food stamps, which was very difficult for them. Her husband's foot continues to be sensitive and he occasionally wobbles. He has to watch the surfaces on which he walks.

Mrs. Bell testified that her husband bought the mowers in June and assembled them about a month or six weeks after she returned from a church convention in late July, 1987. At the conclusion of Mrs. Bell's testimony, the plaintiff rested.

Mrs. Somner was the first defense witness. She testified that the plaintiff mowed the Somner lawn weekly, usually with at least two other people. When Roy Bell appeared on October 7, 1987, he was by himself. She expressed concern because she believed that there was too much yard for one person. It was early morning and there was dew on the grass. After Roy Bell had been mowing for a while, she heard a sound like the mower had hit something. Roy Bell rang the doorbell and he was bleeding. She tried to administer first aid. She called her son to take him to the hospital while she retrieved the toe for possible reattachment. The toe was found to the right of the mower. She packed it in ice and took it to the hospital.

Mr. Somner testified that Roy Bell had cut the yard for him weekly since the spring of 1987. He earned $175.00 per week except when he cut the back acreage and earned an additional $150.00. Mr. Somner testified that Bell had told him he purposely removed the rear guard from the mower. He said that Bell called him from the hospital and Bell asked if he could keep his job, promising that he would not remove anymore toe guards. Somner said they removed the guards to help them to mow faster, but later when Bell's other mowers were brought to the court, Somner admitted that he could not identify the specific mowers used by Bell at the Somner home. The other mowers had the rear guards attached.

The next witness was Gunter Plamper, the MTD project engineer. Mr. Plamper designed these mowers and the toe guards. He received the equivalent of a B.S. in engineering in Germany, and worked as an apprentice engineer for BMW. He worked for Seaman's, an electrical company in Germany, then in November 1964 began as a project engineer with MTD Products. He has worked in their walk-behind lawn mower division since then. In 1970, he was made Chief Engineer of the department, which position he now holds. Mr. Plamper is an industry expert concerning safety with the Consumer Products Safety Commission (CPSC). He is also on the American National Standards Institute (ANSI) lawn mower committee. He is an American delegate to the International Standards Organization (ISO), a body of engineers who seek to synchronize industry standards internationally.

Mr. Plamper testified that the ANSI standards are usually voluntary, but the CPSC standards are mandatory. He personally designed this toe guard in question and this guard complies with all the applicable standards. This shield design was changed in 1987 to the design used today. Although CPSC requires that the guard withstand 100 pounds of pressure for 10 seconds, MTD internal testing requires that the guard withstand 300 pounds, or 100 pounds per rivet for 30 minutes. *The guard was intentionally pulled off in an upward direction, left to right.* The left and middle tears show stress cracks indicating pressure exerted upward and out-

ward on the guard at the rivets. The application of the guard to the machine thus weakened, a large hole tore in the plastic when the guard was separated from the right rivet. The court personally examined the model of the guard attached to the metal rear of the machine and is convinced of the strength of this design and that there is no way this guard failed as testified to by plaintiff and his son. The guard from the other machine was shown to the court, and though it was not introduced into evidence, it had a virtually identical tear pattern to the subject guard.

An examination of this mower showed that it had been used extensively (at least 100 hours) without the deflector, as the deck was worn in front, the tires were worn, the mounting for the wheel was completely worn and into the next hole, the left rear wheel was bent, the up-stop shows wear from use, and there were what appeared to be knife marks on the inside of the housing where someone may have tried to remove grass residue.

Plamper stated that his examination of the shield or guard itself showed that it had been used at least 20 hours judging from the extent of the wear. He also testified that had the shield come off in the manner in which the plaintiff testified, the shield would have engaged the blades and been cut as the machine rolled over it.

Plamper reviewed the warnings that accompany the mower concerning its use, including the warning not to mow down a slope and not to wear tennis shoes. He testified that the toe would probably have still been cut even with the guard in place, but the injury may not have been quite so extensive. That is because the plaintiff, in falling backward and lifting the mower over his foot, would have thwarted the protective purpose of the guard. The warnings advise that one should not mow on a slope with over a 15% grade. The Somner slope was 20–30%. The manual also warns against mowing on wet grass.

The defense economist, Dan Cliffe, testified that based upon his review of the plaintiff's tax returns, his lost income over 20 years would be $11,621.00 to $15,126.00.

Present loss would amount to $4,211.00. The defense rested after Mr. Cliffe's testimony.

The plaintiff called Anthony Robinson and Davis McGee as rebuttal witnesses. These gentlemen worked with Roy Bell doing lawn work in 1987, and they testified that they used mowers other than the Montgomery Ward mowers. The mowers were in court and identified by them, and the mowers had rear guards. Anthony Robinson was working with the Bells the day the guard came off of the mower used by Jarrell, but he did not see that occur.

*Applicable Law*

The plaintiffs bring their action based upon products liability, negligence and redhibition. Their theory under products liability is premised on defective design, composition and inadequate warning. Their action in negligence flows from a claim of breach of duty of reasonable care.

The Louisiana Products Liability Act, La.R.S. 9:2800.51, et seq. does not apply to this case, as the act went to effect after 1987, and the act is not retroactive. *Gilboy v. American Tobacco Co.*, 582 So.2d 1263 (La.1991). Louisiana strict products liability law as set forth in *Halphen v. Johns–Mansville Sales Corp.*, 484 So.2d 110 (La.1986) applies in this case.

The court in *Halphen* provides for three separate theories of design liability: (1) unreasonably dangerous per se, which is the risk/utility balancing test; (2) unreasonably dangerous because an alternative product existed that would serve the same needs and desires with less risk of harm; and (3) unreasonably dangerous because an alternative design existed that was feasible with less harmful consequences.

A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product. *Halphen* at page 114. A product is unreasonably dangerous in construction or composition if, at the time it leaves the control of its manufacturer, it contains an unintended ab-

normality or condition which makes the product more dangerous than it was designed to be. *Halphen,* at p. 114. Although a product may not be unreasonably dangerous per se, or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product was designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. *Halphen,* at p. 114.

■ Louisiana employs a duty-risk analysis in determining questions of negligence. See, *Pierre v. Allstate,* 257 La. 471, 242 So.2d 821 (1970).

■ A redhibitory defect entitling the buyer to annul the sale is some defect in the manufacture or design of the thing sold which renders it either absolutely useless, or its use so inconvenient and imperfect that it must be supposed that the buyer would not have purchased it, had he known of the vice. La.Civil Code Article 2520.

### Analysis of Law and Facts

Based upon the evidence in this case, the court cannot state that the lawn mower which Roy Bell was using when injured was defective in any sense. The evidence does not preponderate that the manufacturer was in any way negligent, nor that there were any inherent defects which would render the use of the mower so inconvenient and imperfect that the court could assume that Mr. Bell would not have purchased the mower if he had known the rear guard would come off.

Montgomery Ward owed the plaintiff a duty of reasonable care in order to avoid subjecting the plaintiff to an unreasonable risk of harm. Although Mr. Glasgow testified that he believed the design of the rear guard to be deficient, and he suggested ways to strengthen the attachment, Gunter Plamper's testimony was extremely compelling. Mr. Plamper designed the mower and the guard. He went into exhaustive detail regarding the various tests that this mower underwent before it left the custody of the manufacturer. Several of these tests, most notably the application of 100 pounds per rivet for one half an hour, exceed the standards. This writer personally examined and attempted to pull the guard off of a model mounting and was unable to do so.

The plaintiffs did not prove that the design of this mower was unreasonably dangerous per se. The machine conformed to all required industry safety standards. Nor have the plaintiffs proven that this mower contained an unintended abnormality or condition which made the machine more dangerous than it was designed to be.

The warnings that were evidenced by the owners manual as well as by Mr. Plamper's testimony were more than adequate. The plaintiff's position that this type of injury was one not contemplated in the warnings is totally without merit. The manual warned not to mow on wet grass, not to wear tennis shoes, keep feet away from blade, keep guards and safety devices in place, not to mow on an incline over 15 degrees slope and not to mow down an incline. All of these plain warnings the plaintiff ignored even though he testified that he at least scanned through the manual, if not actually read the book. There were also warnings on the mower itself which warned that the guards must be kept in place. A manufacturer is required to provide adequate warning of any danger inherent in the normal use of its product which is not within the knowledge or obvious to the user. In this case it is clear that, even if one believed that the guard was to protect against flying obstacles cutting your legs, you should not operate the machine without the guard. It is equally obvious that if one slips and is wearing tennis shoes, the blade could damage any appendage that makes contact with the blade.

Although the plaintiff and his son testified that these mowers remained boxed from June, 1987, to August or October, 1987, and were only used once, an examination of the mower itself indicates a much

more extensive use of the mower. It is inconceivable to this court that the hard plastic wheels of the machine could show this amount of tread wear after one use. Additionally, the marks on the machine indicate extensive use, not one time use as testified by the plaintiffs; the deck was worn on the front, paint was chipped off of the front and rear, the rear of the blade edge was fairly well worn, the wheel mounting was completely worn, the left wheel was bent and the "up stop" showed wear from use.

The court was far more impressed with the testimony of Mr. Plamper, who has devoted his lifetime career to lawn mower design and fabrication, than with Mr. Glasgow, who has absolutely no experience whatever in the design or manufacture of lawn mowers and who spends about 30 percent of his time in "forensic engineering"—providing his opinion to attorneys for substantial fees ($200.00 per hour and $2,000.00 per day in court, and for depositions, plus expenses) regarding the safety of various and sundry products designed and made by others. The court was quite impressed both with the knowledge of industry standards possess by Mr. Plamper and with his obvious concern for lawn mower safety and integrity. The court is convinced that this lawn mower met or exceeded all industry standards, written and implied, and that the warnings were as complete and accurate as any manufacture of a lawn mower could be expected to provide. The testimony of Mr. Glasgow in this case is reminiscent of the summary of the testimony of expert witness George Green in the case of *International Harvester Corp. v. Hardin*, 264 Ark. 717, 574 S.W.2d 260 (1978). There a garden tractor with a lawn mower attachment had backed over a child's foot causing the loss of a toe on one foot and the complete amputation of the other foot. The jury returned a verdict for the plaintiff in the trial court. The appellate court, analyzing the testimony of Mr. Green, who had never designed a lawn mower but had numerous suggestions for devices which could have been added to prevent the accident, stated the following:

"On the basis of the record before us we must conclude that the trial court erred in refusing to direct a verdict in favor of International Harvester Corp. Witness Green's testimony represents the ultimate difference between doing something and talking about doing something. The cowcatcher attachment about which Green testified was all based upon surmise and conjecture for he readily admitted that he had never seen such an attachment on a riding lawn mower and had obviously never tested such a design. In the final analysis his testimony is nothing more than untried theory. Furthermore, since the proof does not show what portion of the lawn mower was backed over the feet of Kristina L. Hardin, the jury would have had to speculate on whether the proposed 18 inch 'cowcatcher' would have prevented the injury in question."

Based upon the testimony of Mr. Plamper, inspection of the mower in question as well as the companion purchased at the same time, and inspection of the rear guards which supposedly fell off the machines on their first use, this court totally rejects the contentions of the plaintiffs that the guard fell off when first used. The court in fact finds that the guards were intentionally removed by forcefully pulling them off as testified to by Mr. Plamper. In reaching this conclusion, the court gives no weight whatsoever to the testimony of Mr. Somner, because the court simply cannot believe that Mr. Bell, in substantial pain from his injury and still at the hospital, would have gone into details about pulling off the guard as testified to by Mr. Somner. Mr. Bell's disdain for guards is further reflected, however, by his own testimony that he took the side deflector off the machine in question before its use on the day of the accident. His excuse was that it would not fit in his truck, though he had had no trouble getting it in his truck with the deflector on it when he had carried it to the Somner home before. This is a relatively small machine, with a 20 or 21 inch cut, and Mr. Bell owned a pick-up truck which accommodated several mowers. The side deflector is a very important

safety feature which prevents objects that could do substantial property damage and personal injury from being hurled from beneath the mower by the blade through the side discharge opening. The deflector causes such objects to be thrown down toward the ground where they would do no harm.

In summary, the court concludes that the plaintiffs have failed to prove liability on the part of defendant on any theory, strict liability, negligence, or redhibition.

The evidence demonstrated that the plaintiff has a history of diligence in trying to provide for his family through various odd jobs. We have no doubt that the plaintiff was seriously injured on October 7, 1987, and that his earning capacity has been impaired. Absent a showing of fault on the part of the manufacturer, however, we cannot order Montgomery Ward to compensate Mr. Bell for these damages.

*Findings of Fact*

In accordance with the above, the court makes the following findings of fact and conclusions of law:

1) The plaintiff, Roy Bell, is married to Laura Bell and they have four children: Jarrell, Cory, Lionel, and Agatha. Mr. Bell and his wife brought this action individually and in behalf on their children.

2) Roy Bell graduated from Ferriday High School in 1975 with a "B" average. After graduation he held various jobs in Monroe, Shreveport, and Longview Texas. Until 1979 Mr. Bell worked primarily as a baker for cafeterias. He then began to repair appliances and refrigerators. Additionally, in the early 1980's, he began mowing lawns. All of these part-time jobs were to supplement his regular income. After leaving Morrison's cafeteria, he worked for the Caddo Parish School Board for four years. He then went to work for Cole Keys, earning $4.42 an hour, while still supplementing his income with appliance repairs and lawn mowing services.

3) On October 7, 1987, the plaintiff was injured while mowing the lawn of J.P. Somner at 13323 Ellerbe Road in Shreveport.

Bell earned from $175.00 to $320.00 for cutting this lawn.

4) Bell arrived at the Somner house about 6:00 P.M. that morning. There was dew on the ground and Bell had to cut on a 20–30 degree incline in front of the house. While mowing the Somner's lawn on October 7, 1987, the plaintiff was injured when his foot came in contact with the mower blade. The blade cut through his tennis shoe and severed two toes.

5) The mower that Bell was using was a Montgomery Ward model, TMO–37023A. The rear toe guard was not on the machine at the time of the accident. Although the plaintiff testified that the machine had hardly been used, the machine showed evidence of significant use and wear. From the tear patterns in the plastic, and the testimony of Mr. Plamper, the court finds as a fact that the toe guard was intentionally torn off the mower.

6) The subject mower contained labeling in conformity with CPSC regulations and the owner's manual contained adequate warnings concerning the use of this product, including instructions warning against mowing down the face of slopes and operating the machine without guards.

7) Bell was cutting across the face of the slope in a rectangular fashion, had cut across, and was proceeding down the incline when his foot slipped. In an effort to maintain his balance, he pulled back on the handle of the mower and pulled the mower over his left foot, causing the big and adjacent toes to be amputated.

8) Mrs. Somner's son took Mr. Bell to the hospital, where he underwent four surgical procedures and remained for 17 days.

9) In December, 1987, Bell returned to his job at Cole Keys. He is presently engaged in lawn service and appliance repairs, although his personal endurance and abilities are limited from the loss of his toes and residual pain.

*Conclusions of Law*

1) The plaintiffs' action in negligence has not been proven. Montgomery Ward owed a duty of reasonable care to

the plaintiff in order to avoid subjecting the plaintiff to an unreasonable risk of harm. *Pierre v. Allstate,* 257 La. 471, 242 So.2d 821 (1970). The evidence failed to show that the mower was deficient in design, composition or fabrication, or that it contained insufficient warnings. The warnings in the owners manual and on the mower itself were adequate.

■ 2) The plaintiffs' action in products liability was likewise not proven. Applying the test of *Halphen v. Johns–Mansville Sales Corp.,* 484 So.2d 110, the plaintiff did not prove that the mower was a) unreasonably dangerous per se; b) that an alternative product existed that would serve the same needs and desires with less risk of harm; or c) that the mower was unreasonably dangerous because an alternative design existed that was feasible with less harmful consequences.

■ 3) The plaintiffs were unable to show that the lawn mower contained a defect at the time of the sale which rendered it absolutely useless or its use so inconvenient and imperfect that the plaintiff would not have purchased it. Therefore recovery based in redhibition is also excluded.

The court will render judgment in accordance with the above findings of fact and conclusions of law.

## JUDGMENT

For the reasons set forth in the opinion of the court of even date herewith, it is

ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of defendant and against plaintiffs, dismissing plaintiffs' demands with prejudice.

IT IS FURTHER ORDERED that all costs be assessed against plaintiffs.

JUDGMENT RENDERED AND SIGNED.